AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Southern District of California


FILED
SEP 1 3 2019
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )   Case No.  **19MJ3957**
Samsung Cellular Phone with Model No. SM-G532M, )
Serial No. R58J300VEEE, and IMEI 357485083367971 )

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the  Southern  District of  California , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 952, 960 | Importation of Controlled Substances |
| 21 U.S.C. § 963 | Conspiracy |

The application is based on these facts:

See attached affidavit, incorporated therein

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

HSI Special Agent Matthew Dempsey
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  9/13/19

_____
*Judge's signature*

City and state:  San Diego, California        Hon. Karen S. Crawford, U.S. Magistrate Judge
*Printed name and title*

# Attachment A

## *Item to be Searched*

The item to be searched is as follows:

> Samsung Cellular Phone
> Model No. SM-G532M
> Serial No. R58J300VEEE
> IMEI 357485083367971
> ("**Target Device**")

The **Target Device** is currently in the possession of the Department of Homeland Security and is presently stored at 9495 Customhouse Plaza, San Diego, California, 92154.

## Attachment B

*Items to be Seized*

Authorization to search the **Target Device** includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the **Target Device** for evidence described below. The seizure and search of the **Target Device** shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the **Target Device** will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, from June 18, 2019 up to and including August 17, 2019:

a. tending to indicate efforts to import methamphetamine or some other federally controlled substance from Mexico into the United States;

b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the importation of methamphetamine or some other federally controlled substance from Mexico into the United States;

c. tending to identify co-conspirators, criminal associates, or others involved in importation of methamphetamine or some other federally controlled substance from Mexico into the United States;

d. tending to identify travel to or presence at locations involved in the importation of methamphetamine or some other federally controlled substance from Mexico into the United States;

e. tending to identify the movement of proceeds associated with the trafficking of methamphetamine or some other federally controlled substance that was imported from Mexico into the United States;

f. tending to identify the user of, or persons with control over or access to, the **Target Device**; and/or

g. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above,

which are evidence of violations of Title 21, United States Code, Sections 952, 960, and 963.

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Matthew Dempsey, having been duly sworn, do hereby state that the following is true to my knowledge and belief:

## INTRODUCTION

1. I make this affidavit in support of an application for a warrant to search the following electronic device, as further described in Attachment A (the "**Target Device**"), and seize evidence of violations of federal law, namely 21 U.S.C. §§ 952, 960, and 963, as further described in Attachment B:

> Samsung Cellular Phone
> Model No. SM-G532M
> Serial No. R58J300VEEE
> IMEI 357485083367971
> (the "**Target Device**")

This search warrant supports an investigation and prosecution of Alfredo Padilla Ybarra ("PADILLA"), who is presently charged with committing violations of 21 U.S.C. §§ 952 and 960. A factual explanation supporting probable cause follows.

2. Officers with the Department of Homeland Security, United States Customs and Border Protection ("CBP"), seized the **Target Device** from PADILLA on August 16, 2019, when he was arrested at the San Ysidro, California, Port of Entry ("POE") for drug smuggling, in violation of 21 U.S.C. §§ 952 and 960. Specifically, PADILLA was found in possession of approximately 40.94 kilograms of methamphetamine hidden in the gas tank, doors, and passenger panels of the vehicle that he was driving. The **Target Device** is currently in the possession of the Department of Homeland Security and is presently stored at 9495 Customhouse Plaza, San Diego, California, 92154.

3. Based on the information below, there is probable cause to believe that a search of the **Target Device** will produce evidence of the aforementioned crimes, as more particularly described in Attachment B.

4. Because this affidavit is being submitted for the limited purpose of establishing probable cause to obtain a search warrant, it does not contain all of the

information known to investigators about this investigation. It contains only those facts believed to be necessary to establish probable cause. In addition, information contained in this affidavit is based upon reviews of official reports and records, conversations with other investigators experienced in the area of drug investigations, and my personal observations and knowledge. When the contents of documents or statements of others are reported herein, they are reported in substance and in part unless otherwise indicated.

## TRAINING AND EXPERIENCE

5. I am a Special Agent (SA) with Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI), and have been employed by HSI since August 2016. I am currently assigned to the Deputy Special Agent in Charge (DSAC), San Ysidro Office, Contraband Smuggling Group IV, and my duties include investigating the trafficking of illicit controlled substances and the importation and distribution of illegal substances. I am cross-designated by the United States Drug Enforcement Administration to conduct narcotics investigations and enforce the provisions of the Controlled Substance Act. I have completed training at the Federal Law Enforcement Training Center, comprising basic criminal investigator training and HSI Special Agent Training. I have received training in identifying various controlled substances and conducting Title 21 controlled substances investigations.

6. In the course of my duties at HSI, I have worked as the case agent, directing specific drug-related investigations. I have also worked as a surveillance agent, where I observed and recorded movements of individuals trafficking in drugs and of those suspected of trafficking in drugs. Additionally, I have participated in the execution of search warrants. I have initiated and executed arrests for drug-related offenses, including possession with the intent to distribute and the importation of controlled substances. I have interviewed defendants, witnesses, and informants relative to the illegal trafficking of controlled substances. Through these experiences, I have gained a working knowledge and insight into the operational habits of narcotics smugglers, with particular emphasis on those who attempt to import narcotics into the United States from Mexico through the San Diego

international ports of entry. In April 2018, I completed basic Mobile Forensics, Cellebrite UFED4PC and Physical Analyzer Training course, designed to familiarize investigators with methods of extracting and analyzing cellular phone data.

7. From February 2008 until August 2016, I was a Border Patrol Agent employed by the United States Border Patrol, which is a component of Customs and Border Protection (CBP), under the Department of Homeland Security. As a Border Patrol Agent, I was assigned to El Centro Station, in Imperial, California, where I participated in investigations into suspected drug smuggling, questioned suspects and witnesses, and conducted vehicle searches related to suspected drug smuggling.

8. Through the course of my training, investigations and conversations with other law enforcement personnel, I am aware that it is a common practice for narcotics smugglers to work in concert with other individuals and to do so by utilizing cellular telephones, and tablets, to maintain communications with co-conspirators in order to further their criminal activities. Conspiracies involving narcotics smuggling generate many types of evidence including, but not limited to, evidence such as voicemail messages referring to the arrangements of travel and payment, names, photographs, text messages, emails, instant messages, social networking messages, maps and directions, and phone numbers of co-conspirators.

9. Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in narcotics and human trafficking investigations, I am also aware that:

    a. Drug traffickers will use digital devices like cellular telephones, tablets, and laptop computers because they are mobile, and they have instant access to telephone calls, text, web, email, and voice messages;

    b. Drug traffickers will use digital devices like cellular telephones, tablets, and laptop computers because they are able to actively monitor the progress of their illegal cargo while the conveyance is in transit;

c. Drug traffickers and their accomplices will use digital devices like cellular telephones, tablets, and laptop computers because they can easily arrange and/or determine what time their illegal cargo will arrive at predetermined locations;

d. Drug traffickers will use digital devices like cellular telephones, tablets, and laptop computers to direct drivers to synchronize an exact drop off and/or pick up time of their illegal cargo;

e. Drug traffickers will use digital devices like cellular telephones, tablets, and laptop computers to notify or warn their accomplices of law enforcement activity to include the presence and posture of marked and unmarked units, as well as the operational status of checkpoints and border crossings;

f. The use of digital devices like cellular telephones, tablets, and laptop computers by traffickers tends to generate evidence that is stored on the digital devices, including, but not limited to emails, text messages, photographs, audio files, call logs, address book entries, IP addresses, social network data, and location data; and

g. Individuals involved in the illegal possession and acquisition of drug trafficking often utilize digital devices like cellular telephones, tablets, and laptop computers with photograph and video capabilities to take and send photographs and videos of other members of criminal organizations, drugs, criminal proceeds, and assets purchased with criminal proceeds.

10. Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I know that cellular/mobile telephones can and often do contain electronic records, phone logs and contacts, voice and text communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack

space, and temporary or permanent files contained on or in the cellular/mobile telephone. Specifically, I know based upon my training, education, and experience investigating these conspiracies that searches of cellular/mobile telephones yields evidence:

    a. tending to indicate efforts to import methamphetamine, cocaine, heroin, or some other federally controlled substances from Mexico into the United States;

    b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the importation of methamphetamine, cocaine, heroin, or some other federally controlled substances from Mexico into the United States;

    c. tending to identify co-conspirators, criminal associates, or others involved in importation of methamphetamine, cocaine, heroin, or some other federally controlled substances from Mexico into the United States;

    d. tending to identify travel to or presence at locations involved in the importation of methamphetamine, cocaine, heroin, or some other federally controlled substances from Mexico into the United States, such as stash houses, load houses, or delivery points;

    e. tending to identify the user of, or persons with control over or access to, the **Target Device**; and/or

    f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

11. Subscriber Identity Module ("SIM") Cards, also known as subscriber identity modules, are smart cards that store data for cellular telephone subscribers. Such data includes user identity, location and phone number, network authorization data, personal security keys, contact lists and stored text messages. Much of the evidence generated by a smuggler's use of a cellular telephone would likely be stored on any SIM Card that has been utilized in connection with that telephone.

12. Furthermore, based on my training and experience, and conversations with

other law enforcement officers who investigate drug smuggling and trafficking, I know that drug conspiracies often require detailed and intricate planning to successfully evade detection. Consequently, drug conspiracies often involve planning and coordination for several months—this planning often occurs through mobile telephones. Additionally, based on my training and experience, and conversations with other law enforcement officers who investigate drug smuggling and trafficking, I know that coconspirators are often unaware when a fellow coconspirator has been arrested and will attempt to communicate with that coconspirator via mobile telephone after his or her arrest to determine the whereabouts of drugs that are being transported.

**FACTS IN SUPPORT OF PROBABLE CAUSE**

13. According to the report of CBP Officer Aguon, on August 16, 2019, Officer Aguon was assigned to vehicle primary inspection lane 9 at the San Ysidro POE. At about 4:06 a.m., a 2001 blue Ford Ranger with California license plates 49662T2 (the "Ford Ranger") approached Officer Aguon's inspection booth. PADILLA, the driver, presented a permanent-residence card with his picture and name on it. I am aware that PADILLA was the driver, sole occupant, and registered owner of the Ford Ranger.

14. Per Officer Aguon's report, in response to Officer Aguon's questions, PADILLA said that he was driving to San Diego, and provided two negative customs declarations. During this exchange, PADILLA was eating a burrito and did not make eye contact with Officer Aguon. Officer Aguon tapped on the gas tank of the F-150 and found that it felt "solid," meaning it felt as though it contained something denser than liquid (*i.e.*, gasoline). Officer Aguon radioed for assistance and had PADILLA put the Ford Ranger in park, turn it off, and hand over the keys. Officer Aguon placed PADILLA in handcuffs and had him escorted to the security office. Other CBP Officers took the Ford Ranger to the secondary inspection lot.

15. According to the report of CBP Officer Grijalva, at about 4:05 a.m. on August 16, Officer Grijalva was conducting roving inspections in the pre-primary inspection area at the San Ysidro POE with his K-9 Unit. At that time, Officer Grijalva received a radio call

requesting assistance in vehicle primary lane 9. When Officer Grijalva arrived at lane 9, he saw CBP Officer Aguon inspecting the Ford Ranger. Officer Aguon told Officer Grijalva that he had tapped on the gas tank, which felt unusually solid. Officer Grijalva deployed his K-9 Unit, and the K-9 Unit alerted on the gas tank. Officer Grijalva then also tapped on the gas tank, and found too that it appeared unusually solid.

16.     According to the report of CBP Officer Lullo, at about 4:13 a.m., Officer Lullo scanned the Ford Ranger using the "Z-Portal" X-Ray machine. Officer Lullo saw anomalies—items not normally appearing in a vehicle—in the gas tank and the doors.

17.     According to the report of CBP Officer Phongsamran, at about 4:30 a.m., Officer Phongsamran was assigned to a physical inspection of the Ford Ranger. Officer Phongsamran found that the Ford Ranger was equipped with an anti-theft device that required the key to be in the ignition, pressing a key FOB three times, and then turning the key to start the truck. After turning on the Ford Ranger, Officer Phongsamran drove it to the secondary inspection lot and took pictures of it. At 5:11 a.m., he began the physical inspection; because the anti-theft system activated at least once, he had to remove the positive-terminal connection on the truck's battery.

18.     Per Officer Phongsamran's report, in the search of the Ford Ranger, Officer Phongsamran found twelve packages in the driver's door, twelve packages in the passenger's door, two packages in the rear driver-side panels, and four packages in the rear passenger-side panels. Testing of samples of these packages showed the presence of methamphetamine. A contract mechanic (*i.e.*, a mechanic hired by CBP) was able to remove the gas tank from the Ford Ranger; the tank contained about five gallons of gasoline and forty-two additional packages. In total, the seventy-two packages comprised about 40.94 kilograms.

19.     At about 6:37 a.m., Officer Phongsamran placed PADILLA under arrest for a violation of 21 U.S.C. §§ 952 and 960. Officer Phongsamran also seized the packages, the Ford Ranger, and the **Target Device**. (Officer Phongsamran's report does not indicate whether he seized the **Target Device** directly from PADILLA. However, I know from my

training and experience that when a person is taken to the security office at the San Ysidro POE, CBP will gather and hold their personal effects; if that person is placed under arrest, the items are then seized. As noted in this affidavit, PADILLA was the driver and sole occupant of the Ford Ranger.).

20. I responded to the San Ysidro POE, and interviewed PADILLA at about 10:42 a.m. I began by providing PADILLA with his *Miranda* rights, which he acknowledged and waived. PADILLA told me that he works for a landscaping company in La Jolla, California, and had worked there for the prior month and a half. He said that he drives straight to work from his home in Mexico, and that the commute takes about two hours. He also said that he normally works with the same crew and goes to about three different places during his shift. PADILLA said that he normally parks his car on the street outside the work address. He added that he usually fills up the Ford Ranger with gas about every three days, and had last filled it about three days prior. He estimated that he puts in about twenty gallons at a time.

21. PADILLA also told me that at home (*i.e.*, in Mexico), he parks the Ford Ranger around the corner from his house and behind a wall, and so would not know if someone had accessed it. He also said that his neighborhood has constant police and military presence. PADILLA could not explain how someone could access the Ford Ranger without his knowledge, given the security system in it, how someone could access it in light of the police and military presence, or how someone could access it in the street in La Jolla; he was not able to give any explanation, except to say that in Tijuana, anything is possible.

22. During the interview, I also asked PADILLA when he had last used his phone, the **Target Device**. PADILLA said that he had called his girlfriend the day before, and that her name and contact information should be in the phone. My interview partner then told PADILLA that the contents of the phone appeared to have been deleted; PADILLA responded by suggesting he had accidentally "pocket-dialed" someone. As my interviewing partner observed at the time, it is not possible to "pocket erase" the contents of a phone.

23. Given the facts surrounding the arrest of PADILLA, and based upon my experience and training, as well as consultation with other law enforcement officers

*Affidavit in Support of Search Warrant*     8

experienced in drug smuggling investigations, I submit that there is probable cause to believe that information relevant to the smuggling activity of PADILLA will be found in the **Target Device**. Such evidence, which could be in the form of communications, records, data (including but not limited to emails, text messages, other social messaging applications), photographs, audio files, videos, or location data:

    a. tending to indicate efforts to import methamphetamine or some other federally controlled substance from Mexico into the United States;

    b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the importation of methamphetamine or some other federally controlled substance from Mexico into the United States;

    c. tending to identify co-conspirators, criminal associates, or others involved in importation of methamphetamine or some other federally controlled substance from Mexico into the United States;

    d. tending to identify travel to or presence at locations involved in the importation of methamphetamine or some other federally controlled substance from Mexico into the United States;

    e. tending to identify the movement of proceeds associated with the trafficking of methamphetamine or some other federally controlled substance that was imported from Mexico into the United States;

    f. tending to identify the user of, or persons with control over or access to, the **Target Device**; and/or

    g. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

I note that though it appeared from the interview of PADILLA that the **Target Device** had been erased, forensic analysis is capable of gathering information from a phone even when contents have been deleted. I describe further in this affidavit the methods that will be used

to analyze the **Target Device**, but note here that based on my training and experience, I believe the fact that the **Target Device** appears to have had contents deleted does not undermine probable cause to search it.

24. Accordingly, based upon my experience and training, consultation with other law enforcement officers experienced in drug trafficking investigations, and all the facts and opinions set forth in this affidavit, there is probable cause to believe that information relevant to the drug smuggling and trafficking activities of PADILLA, such as telephone numbers, made and received calls, contact names, electronic mail (e-mail) addresses, appointment dates, messages, pictures and other digital information are stored in the memory of the **Target Device**. For the reasons set forth above, I request permission to search the **Target Device** for items listed in Attachment B for the time period from June 18, 2019, up to and including August 17, 2019, the day following PADILLA's arrest.

## **METHODOLOGY**

25. It is not possible to determine, merely by knowing a cellular telephone's or tablet's make, model and serial number, the nature and types of services to which the devices are subscribed and the nature of the data stored on the devices. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their devices—both phones and tablets—over the internet and remotely destroy all of the data contained on the devices. For that reason, the devices may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones and tablets do not have hard drives or hard-drive equivalents and store information in volatile memory within the devices or in memory cards inserted into the devices. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models, and some tablets, using forensic hardware and software. Even if some of the stored

information on the devices may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

26. Following the issuance of this warrant, I will collect the **Target Device** and subject it to analysis. All forensic analysis of the data contained within the **Target Device** and any associated memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

27. Based on the foregoing, identifying and extracting data subject to seizure pursuant to these warrants may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within 90 days, absent further application to this court.

**PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE**

28. At the time of the events noted in this affidavit, investigators conducted a forensic download of the **Target Device**. I have not relied on any information obtained from that forensic download in this application. (My interviewing partner was looking at the **Target Device** itself during the interview of PADILLA, not the forensic download.) Going forward, the Government will not rely on the forensic download described in this paragraph, and will rely only on authority to search the **Target Device** provided under warrants.

**CONCLUSION**

29. Based on all of the facts and circumstances described above, I believe probable cause exists to conclude that PADILLA used the **Target Device** to facilitate violations of Title 21, United States Code, Sections 952, 960, and 963.

30. Because the **Target Device** was promptly seized following the arrest of PADILLA at the San Ysidro POE, there is probable cause to believe that evidence of the smuggling offense committed by him continues to exist on the **Target Device**. As stated

*Affidavit in Support of Search Warrant*  11

above, I believe that the date range for this search is from June 18, 2019, up to and including August 17, 2019.

31. WHEREFORE, I request that the court issue a warrant authorizing HSI Special Agents and/or other federal and state law enforcement officers specially trained in digital evidence recovery, to search the **Target Device**, as described in Attachment A, and seize the items listed in Attachment B, using the methodology described above.

I swear the foregoing is true and correct to the best of my knowledge and belief.

MATTHEW DEMPSEY
Homeland Security Investigations Special Agent
Department of Homeland Security

Subscribed and sworn to before me on this 13th day of September, 2019.

THE HON. KAREN S. CRAWFORD
United States Magistrate Judge

# Attachment A

## *Item to be Searched*

The item to be searched is as follows:

> Samsung Cellular Phone
> Model No. SM-G532M
> Serial No. R58J300VEEE
> IMEI 357485083367971
> ("**Target Device**")

The **Target Device** is currently in the possession of the Department of Homeland Security and is presently stored at 9495 Customhouse Plaza, San Diego, California, 92154.

*Affidavit in Support of Search Warrant*                                           1

# Attachment B

## *Items to be Seized*

Authorization to search the **Target Device** includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the **Target Device** for evidence described below. The seizure and search of the **Target Device** shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the **Target Device** will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, from June 18, 2019 up to and including August 17, 2019:

    a.    tending to indicate efforts to import methamphetamine or some other federally controlled substance from Mexico into the United States;

    b.    tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the importation of methamphetamine or some other federally controlled substance from Mexico into the United States;

    c.    tending to identify co-conspirators, criminal associates, or others involved in importation of methamphetamine or some other federally controlled substance from Mexico into the United States;

    d.    tending to identify travel to or presence at locations involved in the importation of methamphetamine or some other federally controlled substance from Mexico into the United States;

    e.    tending to identify the movement of proceeds associated with the trafficking of methamphetamine or some other federally controlled substance that was imported from Mexico into the United States;

    f.    tending to identify the user of, or persons with control over or access to, the **Target Device**; and/or

g. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above,

which are evidence of violations of Title 21, United States Code, Sections 952, 960, and 963.